# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

IN THE MATTER OF C.F. BEAN, L.L.C.,
AS OWNER PRO HAC VICE AND
OPERATOR, AND BEAN MERIDIAN,
L.L.C., AS THE RECORD OWNER, OF
THE BARGE BEAN 20, OFFICIAL NO.
627225, PRAYING FOR EXONERATION
FROM OR LIMITATION OF LIABILITY       CIVIL NO. 1:13cv77-HSO-RHW

CONSOLIDATED WITH:

JERRIE P. BARHANOVICH, EXECUTRIX
AND PERSONAL REPRESENTATIVE OF
THE ESTATE OF MARK BARHANOVICH,
DECEASED       PLAINTIFF

v.       CIVIL NO. 1:13cv84-HSO-RHW

C.F. BEAN, L.L.C.,
BEAN MERIDIAN, L.L.C., AND       DEFENDANTS/
ARCHER WESTERN CONTRACTORS, L.L.C.       THIRD PARTY PLAINTIFFS

v.

SUZUKI MOTOR CORPORATION,
SUZUKI MOTOR OF AMERICA, INC.,
AND RSM INTERNATIONAL, INC.,
D/B/A BOB'S MACHINE SHOP       THIRD PARTY DEFENDANTS

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART SUZUKI MOTOR CORPORATION'S EMERGENCY MOTION TO STRIKE EXPERT AND EXPERT REPORT [526]

BEFORE THE COURT is Third Party Defendant Suzuki Motor Corporation's Emergency Motion to Strike Expert and Expert Report [526]. This Motion is fully briefed. Having considered the parties' submissions, the record, and relevant legal authority, the Court is of the opinion that Defendants/Third Party Plaintiffs C. F.

Bean, L.L.C., Bean Meridain, L.L.C., and Archer Western Contractors have exceeded the scope of discovery allowed on remand in contravention of the Fifth Circuit's mandate and the Magistrate Judge's discovery Orders [502] [513]. Third Party Defendant's Motion to Strike Expert and Expert Report should be granted in part and denied in part, in that Robert D. Bartlett's ("Bartlett") December 4, 2017, Report should be stricken, with the exception that Bartlett may offer the following opinions stated in his 2017 Report at Section "5.0 CONCLUSIONS":

> (1) The similarity in the metallurgical, mechanical, and chemical characteristics of the subject swivel bracket and exemplar type "A" swivel bracket indicate that they were both the same material (sic) that they had the properties intended by the manufacturer for these components.
>
> . . . .
>
> (3) The Suzuki casting material, JIS H 5202 AC4C, of the subject bracket was found to have low Charpy impact toughness values for half-size specimens of less than 2/3 ft-lbs which would be less than 1 and 1/3 ft-lbs for a full sized specimen.

Bartlett may also testify to the opinions stated in his 2014 Report.

## I. RELEVANT BACKGROUND

A. <u>Factual background</u>

This case arises out of the death of Mark Barhanovich ("Barhanovich") on the morning of September 16, 2012. Barhanovich and one passenger, Mr. Eric Ransonet, were operating a 24-foot recreational fishing boat as they traveled toward a fishing reef known as "Katrina Reef" in the Mississippi Sound. Barhanovich Ans., Defenses and Claim [15] at 13. The boat was powered by a single outboard motor.

*Id*. Third-Party Defendant Suzuki Motor Corporation ("Suzuki") "designed in part and manufactured in part the subject 225 horsepower, 4 stroke outboard motor, Model DF225, bearing Serial No. 22501F-510312." Suzuki Ans. and Affirmative Defenses [203] at 3.

During the trip to the fishing reef, Barhanovich's boat and/or motor struck an underwater obstacle. The obstacle turned out to be a dredge pipe owned and operated by Defendants/Third-Party Plaintiffs C.F. Bean L.L.C., as Owner Pro Hac Vice and Operator, and Bean Meridian L.L.C., as the Record Owner, of the Barge Bean 20 (collectively "Bean"), who were engaged in dredging operations pursuant to a sub-contract with Defendant Archer Western Contractors, L.L.C. As a result of the collision, the motor came out of the water and entered the boat, striking Barhanovich and severely injuring him. Barhanovich was transported to a hospital in Ocean Springs, Mississippi, for treatment, but died later that day from his injuries. *Id*.

B.  Relevant procedural history

    1.    The Fifth Circuit's mandate and the Magistrate Judge's discovery Orders on remand

This case has a lengthy procedural history. The Court will not detail all of it here, but only those portions relevant to the pending Motion. Suffice it to say, at this point in the litigation the Court does not write on a blank slate. On November 4, 2016, the United States Court of Appeals for the Fifth Circuit reversed in part the Court's prior Opinion [445] and Order [453], which struck the second Report of

3

Bean's expert Edward Fritsch, and its Opinion [454] which granted summary judgment in favor of Suzuki. Specifically, the Fifth Circuit held as follows:

> We affirm the district court's exclusion of Fritsch's first expert report. However, we reverse the district court's exclusion of Fritsch's second expert report, notwithstanding its untimeliness. Because the district court ruled that Bean could not defeat summary judgment without expert testimony, the district court's grant of summary judgment is also reversed. Finally, we affirm the district court's denial of Bean's motion to conduct additional testing on the motor. On remand, however, we encourage the district court to consider whether to reopen discovery to allow (1) SMC to adequately respond to Fritsch's second expert report and (2) Bean to test the motor. The district court should also consider lesser sanctions for Bean's untimeliness, such as costs and attorneys' fees for SMC's additional discovery.

Order [470] at 6. The Fifth Circuit's Judgment was issued as mandate on December 23, 2016. J. [471] at 1-3. It thus governs, and by its terms limits, the focus of these proceedings on remand.

After the case was remanded to this Court, the parties filed numerous discovery motions. On May 25, 2017, United States Magistrate Judge Robert H. Walker entered an Order [498] consistent with the Fifth Circuit's mandate and granted Suzuki's request for out-of-time discovery and Bean's request to re-depose Suzuki's expert, to the extent that: (1) Suzuki would be permitted to depose Fritsch as to his untimely second expert Report; (2) Suzuki would be permitted to designate rebuttal experts and furnish reports from those experts; and (3) Bean would be permitted to depose the rebuttal experts. Order [498] at 1-2.

The Magistrate Judge then entered another Order [502] re-opening discovery for the limited purpose of allowing testing of the motor, as follows:

> Consistent with the Fifth Circuit's order of remand, the Court finds that Bean should be permitted to conduct additional testing on the outboard engine. However, the Court's permission has several conditions attached. First, costs associated with the testing shall be charged to Bean. This includes attorneys' fees associated with the motions practice connected with this motion and any motions related to the testing issue. The additional testing and out-of-time discovery are the result of Bean's untimely submission of Fritsch's second report; therefore, the cost for out-of-time discovery should fall on Bean. The Court will set a separate deadline for SMC to file its motion for costs and attorneys' fees related to out-of-time discovery. *Second, Bean will be permitted to supplement expert reports based on additional testing, but Bean will NOT be permitted to designate any new experts.* The deadline for designating new expert witnesses has expired. Third, SMC will be allowed to designate rebuttal experts and/or supplement expert designations relating to the additional testing. The Court will conduct a case management conference to set deadlines on out-of-time discovery. Fourth, if Bean wishes to pursue testing under these conditions, Bean shall file within 14 days of this Order a motion seeking Court approval of the testing protocol, thereby allowing SMC the opportunity to lodge any objections to the proposed testing protocol. The parties are urged to reach an agreement on the testing protocol before seeking Court intervention.

Order [502] at 2-3 (emphasis added).

On August 9, 2017, the Magistrate Judge entered an Order [513] stating that the parties had agreed to a testing protocol, with the exception of Bean's request to be allowed to test two exemplars. The Magistrate Judge granted this request over Suzuki's objection. Order [513] at 1-2. The Magistrate Judge denied, as exceeding the scope of remand, other motions filed by Bean seeking to: (1) continue the deposition of Suzuki's Rule 30(b)(6) representative, Order [499]; (2) subpoena certain documents, Order [500]; and (3) lift confidentiality orders, Order [501]. No party appealed any of the Magistrate Judge's discovery Orders.

5

2. <u>Bean's allegations against Suzuki in the Second Supplemental and Amended Third-Party Complaint</u>

Bean sued Suzuki by way of a Third Party Complaint filed on May 1, 2014. The Third-Party Complaint asserted a products liability claim against Suzuki and sought full indemnity, contribution, and/or recovery for any settlement or judgment paid by Bean to Barhanovich.[1] Third-Party Compl. [69]. Bean has amended its Third-Party Complaint three times, on July 17, 2014, on August 29, 2014, and on October 10, 2014. Am. and Suppl. Third-Party Compl. [103]; First Am. and Suppl. Third-Party Compl. [133]; Second Suppl. and Am. Third-Party Compl. [163]. The Second Supplemental and Amended Third-Party Complaint [163] is, and has been for nearly four years, the operative pleading which governs the dispute between the parties, subject now also to the limitations imposed by the Court of Appeals' mandate.[2]

---

[1] Barhanovich and Bean entered into a settlement resolving the claims as between those parties, and Barhanovich was dismissed. Order [426] at 1-2.

[2] Following remand from the Fifth Circuit, on February 7, 2017, Bean filed a Motion for Leave to File Third Supplemental and Amended Third-Party Complaint [474] seeking to assert diversity of citizenship as an additional or alternative basis for the Court's subject-matter jurisdiction. The Magistrate Judge denied this request, finding that the Fifth Circuit's mandate did not include an allowance for amended pleadings. The Magistrate Judge found that Bean's "delay of two years and nine months between Bean's original third party complaint and the instant motion to amend the third party complaint constitutes undue delay," and that "Bean had failed to demonstrate any cause, let alone good cause, for the inordinate delay in seeking to amend." Order [479] at 1-8. In denying Bean's subsequent Motion for Reconsideration [481], this Court adopted the well-reasoned opinion of the Magistrate Judge. Order [520] at 1-9.

At Paragraph 7 of the Second Supplemental and Amended Third-Party Complaint, Bean asserts that:

> [o]n or about September 16, 2012, the said Mark Barhanovich was operating his 24 foot pleasure boat, which was equipped with the aforesaid Suzuki motor and "Flats Jac" jack plate, in the shallow waters of or near Biloxi Bay just off the east end of Deer Island in Harrison County, Mississippi, *at an excessively high rate of speed* when the lower unit or other portion of the Suzuki motor is believed to have struck the water bottom and/or some unknown submerged object, which caused the Suzuki motor's swivel bracket to fracture completely through at a location beyond its hinged connection with the motor's clamp bracket, which allowed the bulk of the motor to separate entirely from the rest of the boat and, impelled by the force of the underwater impact, to rotate upward and to be projected forward into the passenger compartment of the Barhanovich vessel, striking Mark Barhanovich and causing him to sustain traumatic and fatal injuries.

Second Suppl. and Am. Third-Party Compl. [163] at 4 (emphasis added).

4. <u>Bean's expert Reports</u>

Bean filed its Second Supplemental and Amended Third-Party Complaint, which remains the operative pleading, on October 10, 2014. Bean filed its Designation of Experts [526-5] on October 14, 2014, designating Robert D. "Bob" Bartlett, P.E., as an expert "metallurgist and registered professional engineer."[3]

---

[3] Bean designated Edward V. Fritsch, P.E. ("Fritsch"), as "a registered professional engineer and an expert in mechanical engineering, with particular emphasis on the design and testing of boats, other vehicles[,] and mechanical equipment." Desig. of Experts [526-5] at 3. The record reflects that Fritsch has submitted three Reports. Fritsch's October 2014 Report disclosed the opinion that the speed of Barhanovich's boat when it impacted the dredge pipe was 28 miles per hour. 2014 Report [329-2] at 13. His 2015 Report stated that the impact speed was approximately 35 miles per hour. 2015 Report [360-1] at 31. Fritsch's most recent December 2017 Report expresses an opinion that the impact speed was in excess of 31 miles per hour based upon Suzuki's testing. 2017 Report [526-4] at 7.

Desig. of Experts [526-5] at 3. Bartlett's entire October 2014 Report [526-2]
consisted of a mere three pages and stated that he was retained to provide a
"metallurgical evaluation of the fractures associated with this accident." *Id*. at 2.
Bartlett's conclusions were that:

> (1) The fracture through the clevis ears on the swivel bracket appeared to be due to a single application of load, and no evidence was observed which would suggest that a pre-existing crack or fatigue played a part in the fracture.
> (2) The fracture through the body of the swivel bracket appeared to be due to a single application of load, and no evidence was observed which would suggest that a pre-existing crack or fatigue played a part in this fracture.
> (3) The hexagonal hole in the transom plate appeared to be due to the head of the nearby bolt being pulled through that plate as a result of a single load cycle.

*Id*. at 3. This was the sum total of Bartlett's opinions.

After the Magistrate Judge entered the present discovery Orders on remand, the parties conducted testing. Bean then submitted a Report from Bartlett dated December 5, 2017.

Bartlett's December 2017 Report consists of 34 pages, 31 pages longer than his original 2014 Report. The 2017 Report contains a Section "<u>4.0 FINDINGS</u>," which purports to set forth approximately five full pages of findings, one of which is that, based upon the deposition testimony of the passenger in the boat at the time the collision occurred and the passenger's trajectory when the outboard motor

struck the dredge pipe, the boat was traveling at no more than 17 miles per hour.[4]

*Id.* at 27-32.

Bartlett's ultimate opinions and conclusions are found in Section "<u>5.0</u>

<u>Conclusions</u>," as follows:

> (1) The similarity in the metallurgical, mechanical, and chemical characteristics of the subject swivel bracket and exemplar type "A" swivel bracket indicate that they were both the same material (sic) that they had the properties intended by the manufacturer for these components.
> (2) The swivel bracket is a critical component of this outboard motor because there is no redundancy in the form of another component. The swivel bracket is required for the system to be able to function.
> (3) The Suzuki casting material, JIS H 5202 AC4C, of the subject bracket was found to have low Charpy impact toughness values for half-size specimens of less than 2/3 ft-lbs which would be less than 1 and 1/3 ft-lbs for a full sized specimen. Other aluminum materials such as forgings of ASTM B247-15 6061-T6 had impact toughness values for full-size specimens of 10 ft-lbs or greater and an elongation of approximately 7 percent. That forged aluminum would absorb more than 5 times the energy as that used of the subject bracket.
> (4) Since the consequences of a failed swivel bracket can easily lead to death of an occupant, which occurred in this case and other documented cases, the use of a brittle material for a critical component requires special consideration. When critical components are constructed using brittle material and low ductility of less than approximately 4 percent elongation, special care must be taken to ensure that the stresses in the critical component never reach the fracture stress even under shock loads.
> (5) The fracture features, FEA results, and calculation results are also consistent with this scenario. Allisions between outboard motors and obstructions are common enough that an outboard motor should have a means for accommodating such allisions. Though the shock absorber of the PTT system and the design of the swivel bracket can handle allisions with obstructions which produce axial forces on the engine, allisions

---

[4] Mr. Ransonet was the passenger; his deposition, however, was taken on July 28, 2014, and has been available to Bean and Bartlett since that time. Ransonet Dep. Excerpts [346-6] at 1.

9

> which produce some axial and some side load will cause the engine to tip up and out of the side bearing pads. The failure of this engine from such a contact at a speed that was likely more than 17 mph demonstrates that this engine design is defective in this regard.

*Id.* at 32-33.

### 5. Suzuki's Motion to Strike

Suzuki's Emergency Motion to Strike Expert and Expert Report [526] requests that Bartlett's 2017 Report "be stricken or, specifically, the new portions of Bartlett's [R]eport beyond the results of the testing be stricken so that Suzuki Motor Corporation may provide its expert responses to the results of the metallurgical testing." Mot. to Strike [526] at 3-4. Suzuki alleges that Bean violated the Court's discovery Orders, specifically the Magistrate Judge's Order [502] that permitted experts to supplement their opinions but denied Bean's Motion [486] seeking to designate rebuttal experts out of time. *Id.* at 1-3. Suzuki posits that Bartlett was originally designated as "an expert metallurgist and professional engineer," and that in his initial 2014 Report, he "offered only metallurgical opinions." *Id.* 2; *see also* Exhibit "B" – Bartlett's 2014 Report [526-2] at 1-3.

According to Suzuki, Bean is now attempting to re-designate Bartlett as an expert to testify as an "all purpose boat accident reconstructionist," Rebuttal [531] at 1, and the 2017 Report expresses opinions outside the scope of the testing in "areas of expertise not previously disclosed, and a theory of the collision between the Barhanovich boat and the dredge pipe not previously described by an expert," Mot. to Strike [526] at 3; Exh. "A" – Bartlett 2017 Report [526-1] at 1-34. Suzuki

10

concludes that Bean has violated the Order prohibiting Bean from designating new experts and has effectively designated a new expert by expanding Bartlett's expertise to encompass new areas, including

> biomechanics and anthropometry (Ransonet's body's trajectory), hydraulics (speed of oil passage in steering system), polymer chemistry (FTIR analysis of plastic, resilience of dredge pipe HDPE, stress discoloration of unknown plastic), photogrammetry (interpretation of dimensions of parts seen in Coast Guard photographs) and boating accident reconstruction generally.

*Id.* at 1-4; Mem. in Supp. [527] at 6-7.

In its Response [529], Bean concedes that Bartlett was "originally retained to perform a limited metallurgical examination of the subject engine including the fracture area to determine whether there was pre-existing damage, or the fracture had resulted from fatigue." Resp. in Opp'n [529] at 8. Thus, by Bean's own admission, Bartlett was designated for a limited purpose. *See id.* Bean further states that, after remand, Bartlett

> began to develop an idea of what type of analysis he could perform based upon an inspection of the boat and engine as well as metallurgical testing of the subject swivel bracket in the context of the available evidence and the known facts. He suggested a number of metallurgical tests, many of which SMC opposed. Those tests were intended to yield data that could be utilized in an analysis of the entire fact situation to determine the likely cause of the swivel bracket failure and the death of Mark Barhanovich. The data from the metallurgical testing make little sense in the abstract unless they are applied in the context of the known facts and evidence. It was never Mr. Bartlett's intent to have extensive, expensive testing performed simply for the sake of testing, and never use the data to analyze all other information and evidence available to date. That would make no sense.

*Id.* at 8-9.

Bean further argues that Suzuki's own metallurgical expert, Dr. Michael Stevenson,

> generated an expert report which contains findings far afield from metallurgy under [Suzuki]'s criteria. Further, Dr. Stevenson certainly applied the metallurgical findings to the known facts to reach new conclusions. Moreover, Dr. Stevenson's report was also based on recent, unilateral testing of an exemplar not covered by the subject Protocol to which neither Bean nor Archer were invited to participate. This suggests SMC expects a special standard to apply to the Court's admission of SMC's evidence but a more restrictive standard for Bean.

*Id.* at 2.

Suzuki's Rebuttal maintains that the Court's Orders [502] [513] limited the scope of testing to the approved protocol, did not authorize Bean to conduct tests of other components, and did not authorize Bean to tender an expert report which essentially constitutes a new expert opinion and completely changes Bean's theory of the case. Rebuttal [531] at 6-7. Suzuki posits that Bean is attempting to change its theory that Barhanovich was operating the boat at an excessively high rate of speed, as alleged in the Second Supplemental and Amended Third-Party Complaint, and "re-start the case, something that the Court stated it was not going to permit." *Id.* at 7.

## II. DISCUSSION

A. Applicable law

It is axiomatic "that 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'" *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433, 438 (5th Cir. 2012) (quoting *Briggs*

12

*v. Penn. R.R. Co.*, 334 U.S. 304, 306 (1948)). "The mandate rule is a specific application of the general doctrine of the law of the case." *Demahy v. Schwartz Pharma, Inc.*, 702 F.3d 177, 184 (5th Cir. 2012) (quotation omitted). "The mandate rule requires that a 'district court follow both the letter and spirit of the mandate by taking into account the appeals court's opinion and circumstances it embraces.'" *League of United Latin Am. Citizens, Dist. 19,* 675 F.3d at 438 (quoting *United States v. Carales-Villalta*, 617 F.3d 342, 344 (5th Cir. 2010)). A district court is prohibited from reexamining issues already "decided both expressly and by necessary implication" by the court of appeals. *United States v. Teel*, 691 F.3d 578, 583 (5th Cir. 2012) (quoting *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006)). The mandate rule serves the important jurisprudential policy of finality in litigation, and is aimed at precluding obstinate litigants from reasserting arguments and appealing again and again in the hope of obtaining a more sympathetic appellate panel. *See Pineiro*, 470 F.3d at 205.

B.  <u>Analysis</u>

In reviewing Suzuki's Motion and the submissions filed in connection with it, it appears that the parties have proffered no case authority in support of their respective positions. However, as stated previously, this Court is not writing on a blank slate. The issue before the Court is easily resolved based upon the law of the case as set forth in the Fifth Circuit's mandate, and the Magistrate Judge's discovery Orders, which no party appealed. The Fifth Circuit remanded the case

13

and directed this Court to allow Bean's submission of its expert Fritsch's second Report, which the Court of Appeals agreed was untimely, and suggested that this Court consider re-opening discovery for the limited purpose of allowing: (1) Suzuki to adequately respond to Fritsch's second expert Report; and (2) Bean to test the motor.

On remand, discovery Orders were entered allowing very specific and limited testing of the motor, per an agreed testing protocol, and allowing Bean to supplement expert reports based upon this testing. Bean was not permitted to designate new experts or offer new expert opinions. Order [502] at 1-3.

A review of this Court's discovery Orders makes it abundantly clear that Bean was expressly and unequivocally prohibited from designating new expert witnesses or advancing new theories of liability. *Id.* It appears that, in an attempt to circumvent the Fifth Circuit's mandate and this Court's Orders, Bean seeks to advance an entirely different theory of how the motor struck the dredge pipe and what the speed of the boat was at the time of the collision. Despite its position throughout this litigation that the boat was traveling at an excessive rate of speed, Bartlett now advances the theory that the boat was traveling at 17 miles per hour and, rather than striking the dredge pipe head-on, that it struck the dredge pipe at an angle. Bartlett then uses these new theories to conclude that the "engine design is defective." Bartlett 2017 Report [526-1] at 32-33.

14

Bean has effectively re-designated Bartlett as an expert in numerous fields, including accident reconstruction, far beyond those disclosed in his original 2014 designation. Comparing Bartlett's 2017 Report to his 2014 Report, it is clear that Bean has acted in bad faith and has grossly exceeded the scope of the Fifth Circuit's mandate and this Court's discovery Orders. Indeed, Bean has engaged in precisely the same type of conduct it did when it earlier submitted Fritsch's second 2015 Report, which, as the Fifth Circuit agreed, in fact contained new opinions and was not a supplemental report. J. [470]; Opinion [445]; Order [520]. Just as that report was not supplemental, so too Bartlett's 2017 Report is essentially a new, not supplemental, Report. Bartlett's present Report is replete with calculations and references to methods and materials bearing no connection to metallurgy, but instead encompassing areas such as biomechanics and accident reconstruction. Indeed, very little of the 2017 Report appears to be based on the metallurgical conclusions to be drawn from the results of the testing.

By Bean's own admission, Bartlett was retained and designated for a limited purpose, as an expert in metallurgy to express opinions on the fracture area of the engine to determine whether pre-existing damage or fatigue played a role in the incident. He was most certainly not designated as an accident reconstructionist. It was not until remand that Bean apparently determined it needed a new expert in order to pursue an essentially new theory of the case, which is at odds with Bean's allegations in its Second Supplemental and Amended Third-Party Complaint.

15

Specifically, Bean's position throughout has been that, at the time of the collision, the boat was traveling "at an excessively high rate of speed." Second Suppl. and Am. Third-Party Compl. [163] at 4. Now, to achieve its end of finding that Suzuki's product was defective, Bean advances the entirely new theory that, rather than hitting the dredge pipe head-on at a high rate of speed, the boat veered to the left and essentially struck the dredge pipe at 17 miles per hour. To reach this conclusion, Bartlett's expertise had to expand dramatically. It is clear that Bartlett's 2017 Report exceeds the scope of the Court's discovery Orders. Moreover, it is in direct conflict with Fritsch's Reports. Fritsch found that the boat was traveling at speeds in excess of 28, 35, or 31 miles per hour at the time of the collision, while Bartlett now advances the new theory that the boat was traveling at a mere 17 miles per hour.[5]

With respect to Bean's assertion that, because Suzuki's expert Stevenson has allegedly proffered new opinions, Bean's expert should be allowed to do the same, this is an attempt to recast the issue. Unlike Bean, Suzuki was explicitly "allowed to designate rebuttal witnesses and/or supplement expert designations relating to the additional testing" in order to respond to Fritsch's untimely 2015 Report, which

---

[5] The record reflects that Edward V. Fritsch's October 2014 Report disclosed the opinion that the impact speed was 28 miles per hour. 2014 Report [329-2] at 13. His 2015 Report stated that the impact speed was approximately 35 miles per hour. 2015 Report [360-1] at 31. Fritsch's most recent December 2017 Report expresses an opinion that the impact speed was in excess of 31 miles per hour based upon Suzuki's testing. 2017 Report [526-4] at 7.

itself offered new opinions. *Id*. at 2-3. Bean, on the other hand, was only permitted to supplement its Reports within narrow limits.[6] Bean acted in bad faith by submitting an entirely new set of opinions in Bartlett's 2017 Report and by expanding the scope of Bartlett's designation, just as Bean did previously with Fritch's untimely 2015 Report.

Despite the foregoing, a review of Bartlett's 2017 Report reflects that some limited portions of it contain proper supplemental opinions within the field of metallurgy. Specifically, Bartlett will be allowed to testify to the following conclusions found in Section "<u>5.0 CONCLUSIONS</u>," which the Court finds to be proper supplemental opinions within the scope of Bartlett's designation:

> (1) The similarity in the metallurgical, mechanical, and chemical characteristics of the subject swivel bracket and exemplar type "A" swivel bracket indicate that they were both the same material (sic) that they had the properties intended by the manufacturer for these components.
>
> . . . .
>
> (3) The Suzuki casting material, JIS H 5202 AC4C, of the subject bracket was found to have low Charpy impact toughness values for half-size specimens of less than 2/3 ft-lbs which would be less than 1 and 1/3 ft-lbs for a full sized specimen.

The Court finds that the other conclusions stated in Section 5.0 are either beyond the scope of Bartlett's designation and expertise, are not based on the metallurgical

---

[6] Even if Bean were correct that Stevenson improperly offered new opinions, Bean's remedy is to file a motion to strike Stevenson's opinions. Instead, Bean took it upon itself to violate the Court's discovery Orders, apparently subscribing to the view that "two wrongs make a right."

17

tests, are based on information that has long been available to Bean and is not new, or constitute new, rather than supplemental, opinions. Specifically Bartlett's Conclusion (2) is a statement not dependent on any testing and not within the field of metallurgy. The second and third sentences of Conclusion (3) reference other materials, specifically aluminum, which were not part of the testing and fall beyond the scope of Bartlett's original designation. Conclusion (5) is based upon new theories and testing outside the scope of Bartlett's designation as an expert. As such, these opinions will be stricken. Bartlett will, however, also be allowed to testify to the opinions stated in his 2014 Report.

## III. CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. Based upon the Motion, the related pleadings, the record as a whole, including the Fifth Circuit's mandate and the law of the case, the Court finds that Suzuki's Motion to Strike should be granted in part and denied in part, in that the opinions contained in Bartlett's 2017 Report should be stricken, with the exception of the following opinions found in Section "5.0 CONCLUSIONS":

> (1) The similarity in the metallurgical, mechanical, and chemical characteristics of the subject swivel bracket and exemplar type "A" swivel bracket indicate that they were both the same material (sic) that they had the properties intended by the manufacturer for these components.
>
> . . . .

(3) The Suzuki casting material, JIS H 5202 AC4C, of the subject bracket was found to have low Charpy impact toughness values for half-size specimens of less than 2/3 ft-lbs which would be less than 1 and 1/3 ft-lbs for a full sized specimen.

Bartlett may also testify to the opinions stated in his 2014 Report.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Third Party Defendant Suzuki Motor Corporation's Motion to Strike is **GRANTED IN PART** and **DENIED IN PART,** and the opinions contained in Bartlett's 2017 Report are stricken, with the exception of the following opinions found in Section "5.0 CONCLUSIONS":

(1) The similarity in the metallurgical, mechanical, and chemical characteristics of the subject swivel bracket and exemplar type "A" swivel bracket indicate that they were both the same material (sic) that they had the properties intended by the manufacturer for these components.

. . . .

(3) The Suzuki casting material, JIS H 5202 AC4C, of the subject bracket was found to have low Charpy impact toughness values for half-size specimens of less than 2/3 ft-lbs which would be less than 1 and 1/3 ft-lbs for a full sized specimen.

Bartlett may also testify to the opinions stated in his 2014 Report.

**SO ORDERED AND ADJUDGED** this the 28th day of September, 2018.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE